```
              IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF NEBRASKA


UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )       4:06 CR 3040
                                )
        v.                      )
                                )
                                )
JOSE LOPEZ LOYA, and            )   REPORT, RECOMMENDATION
NOE GUSTAVO CHAVEZ LOYA,        )        AND ORDER
a/k/a "GORDO," a/k/a "PICO,"    )
                                )_
                Defendants.     )
```

Defendants have filed motions to suppress evidence resulting from a traffic stop at the familiar Giltner interchange of Interstate 80 in central Nebraska. An evidentiary hearing was held before me on June 5, 2006 with the defendants and counsel present. I now recommend that the motions be denied.

FACTS

On February 14, 2006 the defendants were eastbound on I-80, traveling in a red Toyota. At approximately 10:15 a.m. as they were approaching the Giltner exit they passed signs advising "State Patrol Checkpoint Ahead" (two signs), and "State Patrol Vehicle Check Ahead," "Drug Dog Ahead," and "Drug Dog in Use Ahead." The driver, defendant Chavez Loya (hereafter "Chavez") exited the Interstate on the off-ramp.

In reality, there was no checkpoint. The signs had merely been placed on the sides of the eastbound lanes as a ruse. A Nebraska State Patrol Trooper, Andy Allen, had stationed his patrol vehicle to the south of the exit ramp near some trees, so it was not visible to drivers exiting the Interstate on that exit. See Exhibit 6.

The Giltner exit, Exit 324, is essentially a local road. There are no services of any kind at the exit. At the end of the exit ramp is a stop sign at its intersection with State Spur 41-B, otherwise known as the "Giltner Spur." Three miles to the south is the village of Giltner, in which there are no restaurants or gas stations or lodging accommodations. To the immediate north and south of the exit are farmhouses, and the trooper testified that he personally knows the farmer who lives on the south side of the exit, as well as all of his vehicles. He is also familiar with the other nearby residents. State Spur 41-B leads north approximately three miles to state Highway 34, an east-west, two-lane paved roadway.

Twelve miles west of this exit is Exit 312, the principal exit for Grand Island, Nebraska, at which there is a full range of services, including lodging, fuel, and restaurants. Between the two exits is a rest area for eastbound traffic at mile marker 315. Hence, the Giltner exit is utilized primarily, if not solely, by "local" traffic.

In operating a ruse checkpoint, Trooper Allen testified that he does not stop every vehicle which exits the Interstate at that exit. Rather, he stops only those that have "moving violations or plate violations or broken windshields, or pull up on the shoulder for no reason and stop. They have to make a violation."

At approximately 10:15 a.m. Trooper Allen observed two cars exit the Interstate on Exit 324. First was a red car, and it was followed--too closely in the trooper's judgment--by a black car. The red car "rolled through" the stop sign at the end of the exit ramp without stopping, and turned left. The black car stopped at the stop sign, signaled, and also turned left (north).

Trooper Allen decided to stop the red car for running the stop sign, and he also decided to try to stop the black car for following too closely behind the red one. (He stated that they were so close it appeared "the red one was towing the black one"). He followed them northbound on State Spur 41-B, during which he observed the black car again following at too close a distance behind the red car. (Again, he stated that the black car was so close it appeared the red one was towing it). After passing an intervening "local pickup," he caught up to the vehicles and activated his in-car video camera. At the intersection with Highway 34, the two vehicles stopped in accordance with a stop sign, signaled, and turned left (west). At that point Allen passed the black vehicle and tried to stop both vehicles, but the black car's driver apparently did not understand his signal to "pull over" behind the trooper's vehicle, and it continued westbound after the red car did pull over and stop.

Trooper Allen exited his patrol unit and approached the red vehicle on the passenger side. There were two occupants, and Allen initially spoke to the driver, defendant Chavez. The passenger was defendant Lopez. Allen asked for the driver's operator's license and registration for the vehicle. The driver responded he had no license, and the passenger retrieved the registration from the glove compartment and gave it to the

3

trooper.  The trooper asked who was the owner of the vehicle, and the passenger replied, "Juan."  However, the car was registered to a different, absent person, Geraldo Perez, in San Jose, California.  The occupants said they had borrowed the car.  In response to the trooper's question, "Where is Juan today?" the passenger said he did not know.  The passenger had no identification with him.

Because the driver had already disclosed that he had no driver's license, Trooper Allen requested the driver, in English, to come back to the patrol car so Allen could write him a citation and inquire further into the registration and the purpose of the occupants' travel.  The driver complied with the request.

In the patrol vehicle the driver stated that he had a Mexican driver's license, but not a U.S. license, and he and the passenger were on their way to the "state capital" of Nebraska.  He did not possess his Mexico license.  The trooper then began completing the paper work for a citation and telephoned another trooper nearby to ask him to look for the black car that had been following.

The conversation between Trooper Allen and defendant Chavez was recorded on the trooper's in-car video camera recording equipment.  However, the recording (Exhibit 1) is very difficult to decipher.  At the court's request, a sound-enhanced version of the audiotape was provided, which is somewhat better, but still difficult, at best, to understand.

Trooper Allen returned to the stopped vehicle and talked with the passenger, Jose Lopez Loya ("Lopez") about the trip.

4

The passenger stated that the two of them had been snow boarding in Colorado for five days. In response to the trooper's question about why they had left the Interstate and then turned back west on Highway 34, Lopez stated that they just wanted to "look around" the area. Allen also asked if the two vehicles were traveling together, and Lopez responded that they were. Trooper Allen asked Lopez if there were any guns or drugs in the vehicle, and he stated, "no." Trooper Allen then asked if he could have permission to search the vehicle, and Lopez said, "Yeah, no problem." All of this conversation was in English, and the passenger had no difficulty conversing. Lopez's demeanor was very "laid back," friendly, and cooperative.

After returning to the cruiser, Trooper Allen finished completing the warning and citation. He testified that he explained to Chavez that he needed to get a United States driver's license, and also to come to a full stop at stop signs.

Allen finished writing the citation and warning, and Chavez signed it, but Allen did not then give it or the registration to Chavez. He testified that he did not give Chavez the papers because "I still had some more questions. There was stuff that didn't make sense to me. I wanted to ask more, more questions." He returned to the Toyota and conversed with the passenger, after which he returned to his cruiser.

Allen then asked Chavez simply, "Pistolas?" Chavez answered, "No." Allen asked, "Drugas?" Chavez again said, "No." Allen then asked, "Marijuana?" Chavez said, "No, nada" ("no, nothing"). Allen then asked, "Cocaine?" Again Chavez said, "No, nada." After a few minutes delay, during which Allen was apparently making a phone call, Allen repeated these one-word

5

questions.  Chavez again answered, "No, nada" to all of them. Allen asked several times for permission to search the vehicle, using a word, "escucar."[1]  Chavez can then be heard on the videotape to ask, "...no?" in a confused-sounding voice.  At one point on the video Trooper Allen can be heard to say, "No problem?" and Chavez's response is not audible.  Allen testified that Chavez nodded affirmatively and gestured toward the red Toyota and the passenger several times, which Allen took to mean that even though Chavez was giving his own permission to search the car, Lopez, the passenger, was the one whom he really should ask.  Allen also interpreted Chavez's actions as reflecting his desire that Allen leave him alone, because Chavez was obviously "scared to death."  Since Allen had already been given explicit permission by Lopez, he returned to the stopped vehicle and asked Lopez to step out.  Allen then commenced the search.

Allen did not use any written consent-to-search form, in either Spanish or English, and did not attempt to obtain the services of an interpreter.  He testified that it would have taken an hour to get an interpreter on the scene, and he thought he was communicating with Chavez sufficiently well that he did not need one.

Although the trooper's actions in searching the car were visible to the driver and the passenger, neither defendant

---

[1] This is a phonetic spelling.  It was difficult to understand the trooper's testimony as to this word, and he was not asked to spell it.  The Spanish word "buscar" means "to look for," but on neither the tape recording of the hearing or the audio portion of the videotape does it sound as though he used that word, and Allen testified he did not use any form of the word, "buscar."  A search of an on-line ("Yahoo!") Spanish-English dictionary yielded no match for various possible spellings of "escucar."

objected when the trooper began the search, nor at any time during the search.

## DISCUSSION

Defendant Lopez's motion challenges the traffic stop on the ground that it was pretextual; that any consent to search was not voluntary; that any statements made by Lopez were made in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) and were involuntary, in violation of the Fifth Amendment; and that the search of the vehicle--and any resulting seizure of items or statements--violated the Fourth Amendment.  However, at the conclusion of the hearing Lopez, through counsel, abandoned any challenge to statements except as "fruits of the poisonous tree." He continues to contest the legitimacy of the traffic stop and the validity of the search.

Chavez's motion does not identify what, specifically, he is challenging; I construe his motion to challenge only the legitimacy of the stop and the search.  In addition, although not mentioned in the motion, Chavez argued that the trooper's expansion of the investigation after the purposes of the traffic stop had been completed violated his Fourth Amendment rights.

<u>The Stop</u>

The evidence is uncontroverted that defendant Chavez did not stop at the stop sign at the end of the exit ramp.  Trooper Allen testified that he "rolled" through it.  Thus, there was probable cause for the stop.  "Any traffic violation, however minor, provides probable cause for a traffic stop.  <u>United States v.</u>

Barragan, 379 F.3d 524, 528 (8th Cir. 2004)." U.S. v. Cortez-Palomino, 438 F.3d 910, 912-913 (8th Cir. 2006). Running a stop sign is a traffic violation. See, Neb. Rev. Stat. §60-6,147.[2]

    Defendants argue that the stop was pretextual in that it was actually "for the sole purpose of establishing a pretextual and nonexistent checkpoint designed to further drug trafficking interdiction." Lopez Brief, filing 17, p. 2. The Eighth Circuit Court of Appeals has upheld nearly the same actions by law enforcement officers in two separate Missouri cases, decided by different panels only three days apart, and involving "ruse checkpoint" stops at the same Interstate 44 exit in circumstances nearly identical to those in this case. U.S. v. Martinez, 358 F. 3d 1005 (8th Cir. 2004); U.S. v. Williams, 359 F. 3d 1019 (8th Cir. 2004). So long as the officers follow the requirement for individualized probable cause, as Trooper Allen testified he did in this case, the ruse checkpoint tactic is permitted. Williams, 359 F. 3d at 1020-21 (distinguishing U.S. v. Yousif, 308 F. 3d 502, 503 (8th Cir. 2003) which held that stopping *every* car that took the exit at the ruse checkpoint violated the principle of individualized suspicion), citing City of Indianapolis v. Edmond, 531 U.S. 32 (2000).

---

   [2] Defendant Lopez's argument that he did not commit a traffic violation by running the stop sign because exigent circumstances--specifically, that if he had not proceeded immediately into the intersection, he would have been struck from behind by the black car following him too closely--while novel, is not supported by any evidence or by case law. Even if doing so might have been necessary to avoid a rear-end collision, it would not "erase" the violation, nor, as applicable here, probable cause for the stop.

8

Defendants have not suggested any other basis for their "pretext" argument, and in fact, even if Trooper Allen did have some ulterior motive for stopping this vehicle, it would be irrelevant, so long as the facts, viewed objectively, support the finding of probable cause. Whren v. United States, 517 U.S. 806, 813 (1996). Williams, 359 F. 3d at 1021 (court assumed trooper had heightened suspicion of cars exiting because of the ruse checkpoint signs, but noted that such suspicion was not individualized and was not alone sufficient to establish probable cause for a stop). There is no evidence of ulterior motive here.

Expansion of the Stop

Defendant Chavez argued that the trooper was not justified in expanding the scope of the stop after the purpose of the traffic stop had been served and completed.[3] He argues that Trooper Allen should have allowed the defendants to leave once he had completed the paperwork and process necessary for the issuance of the citation and warning.

Trooper Allen's testimony did not delineate specifically when he ended the traffic stop. Unlike other cases in which troopers have explicitly ended the "traffic portion" of the stop, Trooper Allen testified that once he finished all the paperwork for the citation and warning, he did not give it to Chavez, but instead, continued his investigation into possible criminal activity. He stated he did so purposely, because it was his understanding that "Once I give him the citation, I'm done." He

---

[3] This argument was not raised by Chavez's motion, and it was not supported by a brief. Thus, the court may treat it as abandoned. See, NECrimR 12.3(b)(1). Nevertheless, I shall address it briefly.

also testified that at that point in the stop, he continued to be suspicious that criminal activity may be afoot, and wanted to ask more questions.

His suspicion was reasonable. First, the cars did exit after the ruse checkpoint signs and they were not "local" traffic to that area. Second, they had just passed several exits offering a full range of services to motorists, while this exit had none. Third, Lopez told the trooper that "Juan" owned the vehicle, and no "Juan" was present. Fourth, the registration was not in the name of any "Juan" at all. Fifth, the car was registered to Geraldo Gonzales, who also was not present. Sixth, the cars had driven north to Highway 34 and turned *west*, the opposite direction from their travel direction. Seventh, when asked why they did so, Lopez said it was to "drive around." Eighth, the second, following car, had not stopped when he signaled for it to "pull over." Combined, these suspicious facts gave Allen reasonable, articulable suspicion to expand the traffic stop to determine whether criminal activity was, in fact, occurring.

> Given [Chavez]'s traffic violation, [Allen] had probable cause to stop [the] vehicle and conduct a reasonable investigation. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir.1994) (en banc). "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir.1998). "An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants." United States v. Barragan, 379 F.3d 524, 529 (8th Cir.2004) (citations omitted). "'[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the

>    purpose of the stop.  Similarly, the investigative
>    methods employed should be the least intrusive means
>    reasonably available to verify or dispel the officer's
>    suspicion in a short period of time.'"  <u>Bloomfield</u>, 40
>    F.3d at 916 (quoting <u>United States v. Willis</u>, 967 F.2d
>    1220, 1224 (8th Cir.1992)).  An investigative detention
>    may turn into an arrest if it "lasts for an
>    unreasonably long time or if officers use unreasonable
>    force."  <u>United States v. Navarrete-Barron</u>, 192 F.3d
>    786, 790 (8th Cir.1999).
>
>       "If, during a traffic stop, an officer develops a
>    reasonable, articulable suspicion that a vehicle is
>    carrying contraband, he has 'justification for a
>    greater intrusion unrelated to the traffic offense.'"
>    <u>Bloomfield</u>, 40 F.3d at 918 (quoting <u>United States v.
>    Cummins</u>, 920 F.2d 498, 502 (8th Cir. 1990)).  Whether
>    an officer has reasonable suspicion to expand the scope
>    of a stop is determined by looking at "the totality of
>    the circumstances, in light of the officer's
>    experience." <u>United States v. Carrate</u>, 122 F.3d 666,
>    668 (8th Cir. 1997) (citations and quotation marks
>    omitted).

<u>U.S. v. Sanchez</u>, 417 F.3d 971, 974-975 (8th Cir. 2005).

In this case Trooper Allen had reasonable suspicion developed during the traffic stop that the defendants' stories "didn't make sense" and criminal activity may be occurring.  He was justified in detaining Chavez and Lopez, i.e., expanding the traffic stop, to enable him to make additional inquiry and dispel his suspicions.  Although it would have been prudent for him to clearly state the traffic stop was over and then ask Chavez if he would answer a few questions, there was no need to ask for a "voluntary encounter" when he was justified in further detaining the driver and passenger to get additional information.  The detention was not lengthy and no force or restraints were used.  The traffic stop was no unlawfully expanded into a full investigation.

11

The Consents

Trooper Allen asked both defendants if there were any guns or drugs in the vehicle, and both said there were none. In response to Allen's request for permission to search the vehicle, Lopez readily and unequivocally consented.

Chavez's responses to Allen's questions were not explicit, however, and there was a considerable language barrier between them. The audio portion of the tape is practically inaudible, with exceptions of a few words; it is insufficient to meet the government's burden of proof. Trooper Allen testified that he took Chavez's actions and words to mean that Chavez was giving consent to search, even though directing Allen to Lopez. The issue is whether, in the totality of the circumstances, Allen's interpretation of Chavez's actions was reasonable.

The circumstances include: Chavez was being detained in a patrol cruiser but on a public highway, not a secluded place. Allen was cordial throughout the stop and never raised his voice, drew his weapon, or took any other "command" actions. Chavez had little understanding of English. Chavez appeared "scared" but was cooperative, that is, he did not raise his voice or become argumentative. He did not appear to be impaired. He did nod his head affirmatively when asked by Allen for permission to search; he did not say "no" or shake his head negatively or indicate to Allen with his hands that he did not understand the question. He did not protest during the search after he could see what Trooper Allen was doing.

On the other hand, the circumstances also include: Allen did not speak Spanish, and the word he seems to have used in

12

asking for permission to search, if it exists, does not mean "to search for" or "to look for," as Allen believed.  Allen did not use, or even check to see if he had, a written consent-to-search form, although he usually carries them in both English and Spanish, because he thought he and Chavez were effectively communicating.  Allen did not advise Chavez he did not have to consent.  Allen did not give back the car's registration or give Chavez the citation and warning before proceeding to inquire about drugs and guns, that is, there was no indication by Allen that Chavez was free to leave or was not required to acquiesce in anything and everything the officer asked.

     This is a very close question.  I conclude, however, that the evidence preponderates, by the slightest of margins, in favor of the finding that Chavez did consent to the search.  I reach this conclusion for two principal reasons.  First, had Chavez not understood what Allen was asking, he would not have nodded affirmatively after the question was asked; he would have shaken his head or held up and/or shaken his hands or in some other way indicated that he did not understand.  Second, it is telling that Chavez made no protest once he could see Allen commencing the search; if he had not consented, he would have somehow expressed surprise (at least) once he knew Allen was searching the car.  I therefore conclude that Trooper Allen's belief that Chavez had also consented to the search was reasonable.

     There is nothing in the evidence to indicate that the consent of either defendant was less than completely voluntary.  No force or heavy-handed tactics were used, and neither defendant alleged any such actions.  I therefore conclude that each defendant voluntarily consented to the search of the vehicle.

     IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Warren K. Urbom, United States Senior District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the motions to suppress, filings 17 and 19, be denied in all respects.

     The parties are notified that failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the trial judge's adoption of the recommendation.

     FURTHER, IT HEREBY IS ORDERED, Trial of this case is scheduled to commence at 9:00 a.m. on August 7, 2006 in Courtroom #4, United States Courthouse, Lincoln, Nebraska.  Trial is scheduled for a duration of three trial days.

     DATED June 16, 2006
                          BY THE COURT:

                          s/ *David L. Piester*
                          United States Magistrate Judge